Thank you, Your Honor. And may it please the Court, Anton Metlisky for Sirius XM. I'd like to reserve four minutes, if I could, for rebuttal. All right. The plaintiff's position is that Section 980A2 of the California Civil Code gives it the absolute right to prevent anyone who lawfully purchased a sound recording from playing it. That includes not just Sirius XM, but AM, FM radio stations, bars, restaurants, DJs at school dances, and even individuals. Nothing in the statute's text, history, purpose, or context supports that radical result. Now, plaintiff's entire argument turns on the proposition that when the California legislature unanimously and without debate applied the words exclusive ownership in Section 980A2 to sound recordings, it unambiguously granted sound recording owners this absolute unfettered performance right. But this Court has already rejected that textual argument in Pandora, which held that the term exclusive ownership doesn't tell you the scope of the ownership right, and that that question can only be answered by context. And here, the context points squarely against plaintiff's construction. Now, I know that you take the position that I know there's an amicus brief submitted by some professors, and I think you take the position that basically that there's a common law interpretation of what this means, correct? And you have to go all the way back to the original meaning and that they keep passing it, correct? Well, our position is that the text itself, as this Court already held in Pandora, doesn't answer the question because the question is what the ownership right in a sound recording is, and that that question has to be determined by context. And I think there are three contextual factors that the Court should look at in particular, including the exclusivity. Do we have to find exclusive ownership is ambiguous in order to get to your argument? Well, I don't think it's ambiguous. I think it clearly means what we say it means and not what the plaintiff says it means. But if you think it's ambiguous, then you would also have to find for us because every other tool of construction points in our direction. And the first thing I would say is, when you're trying to figure out what ownership in a sound recording would have meant in 1982 to somebody, you know, reasonably understanding the extant law at the time, the question is what was the law? And the answer is that ownership of a sound recording at the time meant a right against unauthorized duplication. That is a piracy right. That was the law in California under cases like Heilman and Erickson in this Court's decision in Lone Ranger. And it was the law under the Federal Copyright Act as well. And so the reasonable construction of ownership when it comes to sound recordings in particular would have been a piracy right and not a performance right, which had never been recognized in California or federal law. Now, is this the only case that makes that recognition as a performance right? Is this the only case? I think the same district court in the Pandora case also held this way. But it was certainly the first case. And then there were subsequent cases in other states. So Judge McMahon in the SDNY, for example, agreed with the district court here. But then it went up to the Court of Appeals, and the Court of Appeals held that there was no performance right under New York law. The Florida Supreme Court likewise held that there was no performance right under Florida law. And we think the same thing is true here. Now, that's what you... Counsel, what impact does the Pennsylvania rule have? As I understand it, that is the one state that is the exception and recognizes as a common law right public performance. How has that impacted Sirius's broadcasting? So, you know, I'm not sure. So the Pennsylvania rule is not the kind of absolute performance right that the plaintiff seeks here. The Pennsylvania rule in Waring from 1937 included an understanding between the parties that the sound recording owner would be able to control subsequent performance. It was in the label. After 1940, after 1940 and Judge Hans Whiteman's decision, everybody, including every relevant stakeholder, including the record companies, understood that as a general matter, states did not recognize a performance right in sound recordings. So Sirius has never paid owners who have some tie to Pennsylvania, any type of royalty? Not that I'm aware of, Your Honor. I'm not even aware of a lawsuit that has been filed in Pennsylvania, you know, any time in the last few decades. And I think this is particularly clear because the legislative history makes clear that the 1982 amendment here was meant to conform California law to federal law. And federal law was a piracy right for post-1972 recordings. And so California law is reasonably right, I think, to extend that same piracy right to pre-1972 recordings. And then finally, I think the general context in which this right has been considered ever since Judge Hans' decision in Whiteman, which rejected even the limited right recognized in Waring, ever since then, every single stakeholder has recognized that there is no performance right in sound recordings, which is why the record companies themselves were asking Congress to recognize that right for decades. And Congress was... What do we do with the federal copyright law, which has an express carve-out for public performance and California doesn't? So how do you reconcile that? So I think there are two answers to that, Your Honor. One is a technical answer and one is a sort of practical one. The technical answer is that the way that the federal copyright statute works is that every possible bundle of copyrights is set forth in Section 106. And at the time that the Copyright Act was enacted, there were four bundles. So 106.1 was the reproduction right. 106.2 was derivative rights. 106.3 was distribution. And 106.4 was the right of public performance, which applied to things like plays and movies and like musical compositions. And so under federal law, just as a technical matter, when Congress grants somebody a copyright, if it doesn't want to give them every one of those bundles of rights, it has to exclude the one that it doesn't want to grant. And that's exactly what Congress did in 114.a. That's the structure. It said, you know, the copyright includes the rights specified in clauses 1, 2, and 3 of Section 106, but do not include any right of performance under 106.4. Now, so the California legislature doesn't have any similar kind of technical requirement. And if it was trying to, if the legislature was looking at that federal law, it couldn't have mirrored it even if it wanted to because there is no 106 equivalent. Now, the practical answer is that Congress had squarely before the question whether it should recognize a performance right. The record companies were asking for one. They were asking for a compulsory right, not the kind of expansive absolute right that the plaintiff here is asking for. But still, they were asking for a limited right. And the Congress in the legislative history makes clear that it didn't want to grant the right in 1976, but that it wanted further study. So 114D tells the Register of Copyright to go ahead and study the issue further. So I think Congress obviously felt compelled to say what it was it wasn't doing with respect to a performance right in the 76 Act, whereas nobody, not a single legislator, not a record company, not any stakeholder suggested to the California legislature that a performance right should be included in the 1982 amendment. And of course, that would have been an absolutely seismic change in the law. Again, nobody since Whiteman had thought that a performance right exists. And even Congress, by the time it enacted a performance right, enacted a highly limited one. It excluded AM, FM radio. It excluded bars and restaurants and the like, businesses that play music. And it provided for a compulsory licensing regime so that record companies couldn't actually preclude broadcasters from playing their music. Whereas the right that the plaintiff wants here is absolute. It doesn't include a compulsory licensing regime. It would, again, it would apply to AM, FM radio. It would apply to bars, restaurants. It would apply to people, it seems to me. So I understand context. You put a pot of money in the settlement right now, and then you reserve the right to come and talk about this. And is there, what, another five million out there that could get thrown in the pot? Or what exactly is the story? Yes. Yes, and the royalty rate going forward is affected by the settlement as well. And of course, this court has held that settlements that depend in their size on later litigation don't deprive the court of standing if that's what the court's getting at. But yes, that's approximately what the result of this appeal would be. OK. So if we agree with you on 980, then we don't have to get to your argument on the Dormant Commerce Clause. Is that correct? Exactly right. Yeah, the Dormant Commerce Clause only comes up if you think there is a performance right, which means that California would preclude SiriusXM from performing, meaning playing, its sound recordings. And federal law requires Sirius, when it broadcasts anything, to broadcast it identically everywhere in the contiguous 48 states. So that would be just a direct regulation of commerce in every state, not just California. OK, so how do you reconcile the fact that the federal law recognizes the public performance right with your assertion that the recognition of California's right of public performance would unduly burden interstate commerce? So doesn't the federal law's adoption of the right suggest that requiring the payment of royalties to the owners of recordings doesn't create an undue burden? No, I don't think so, Your Honor, because first of all, the federal law creates a compulsory licensing regime. If we're just talking about SiriusXM now, not the entities to which the federal law doesn't apply at all, but as to SiriusXM, it creates a compulsory licensing regime. The right that the plaintiff says exists is just an absolute right. SiriusXM wouldn't have the ability to play their music unless they say it's OK, right? And so I don't see how there could be a local benefit to prevent music from being played. And it's very hard to imagine how that wouldn't unduly burden interstate commerce when the whole point of the Copyright Act, the Federal Copyright Act, is to make sure that music gets out to the public, to the listening public. This would allow record companies from precluding it altogether. You're at basically a little under four minutes. Do you want to reserve? I would, Your Honor. Thank you. OK. Unless my colleagues have any questions right now. Yeah, I do have one question. OK, go ahead. And it relates to preemption from MMA. I read your letter. But if you can explain why the preemption doesn't apply. Are you arguing that you guys just contracted out of the system? Or what requirement has not been met under the statute? Yes, Your Honor. So the preemption provision is 1401E1, right? 1401D1 allows parties to enter into voluntary agreements that then wouldn't be governed by the federal scheme. And that's what we did. I mean, we did it before the MMA was adopted. But that provision allows that kind of agreement going forward. Now, 1401E1 only applies if, first of all, the federal scheme would apply otherwise. That part of it is satisfied here. If there were an agreement, the federal scheme would apply. But the second part of it, B1, or B little i, is that the broadcaster has to pay, comply with the federal scheme going retrospectively. So including paying back royalties under the federal licensing scheme, which just didn't happen here because we were paying royalties and the settlement and the like under our own voluntary agreement. Now, there's a second provision, B2, or B little ii, which doesn't apply here either. That's about what happens if you enter into an agreement. Then after the agreement, there's a broadcast, a performance. And the sound recording owner tries to sue you for that later broadcast, which just has not occurred here. So that's why we think that nothing in the preemption provision governs here. OK. Since we took a little of your rebuttal time, I'll give you three minutes for rebuttal. OK. Thank you. All right. We'll hear from the appellee. Good afternoon. Good afternoon, Your Honor. Kulpana Srinivasan on behalf of the plaintiff appellee, Flo and Eddie. Sirius XM describes construing 980 as conferring exclusive ownership rights and sound recordings as some radical result. And the history of the law in California and the comparison to what the Congress did in the federal statute shows that it's absolutely not. And it is what the California legislature intended. Now, there's a whole line of- What took your client so long to bring this claim? If that were true and everybody understood that change in 1982, why are we now seeing it in 2021 for the first time? Your Honor, part of that is, and obviously the case that we're talking about here today was brought in the early part of the 2010s, but technology has evolved. And a company like Sirius XM is able to buy a CD and to digitally stream it to 30 million users. But your argument would require AM radio stations to pay every time they play a pre-1972 sound recording, would it not? Only if a sound recording owner elected to pursue a royalty or license from a radio station. And historically- But that gets back to my question, Counselor. So what took your client so long to assert this claim if everybody knew that far back that the law had changed in 1982 in California? There were good reasons historically not to pursue radio broadcasters. That was actually a benefit to sound recording owners to have their music publicized and that it encouraged record sales. But doesn't Sirius do the same thing to your client's benefit? That's what I'm having a difficult time understanding your theory and why it took this long to assert it. Your Honor, it does not. What Sirius XM does, it is able to stream perfect digital sound to 30 million subscribers that pay royalties to Sirius XM. And as the district court found below, that actually undercuts the value of Flo and Eddie being able to sell its sound recordings or to license them. And so in this situation, it's appropriate for the owner of the sound recording to pursue those rights. The technology has changed it dramatically to find that it would be totally inequitable for Sirius XM to do what they do. But doesn't it benefit your client if the sound recording is reaching a larger share of music listeners? Not if they don't ultimately buy a recording. If that music is played so that nobody needs to ever go out and purchase Flo and Eddie's sound recordings directly, then it is cannibalized what their sales of their records would be. And one reason- So is your answer that your clients were willing to put up with a lack of royalties in a smaller geographical market that would be reached by a traditional AM-FM radio station, but they now want to assert that right with regard to an entity that's able to reach the entire United States and the entire listening population? That's correct, Your Honor. The balance of what can be, what the benefits of radio broadcasting are for a sound recording owner are different. And that doesn't negate the existence of the right, but I'll note that Judge Gutierrez found a violation under three grounds, the statutory ground, but also under unfair competition and conversion, which we did not hear Siri XM address today. But my concern is, counsel, my concern is the same. We're hearing these claims for the first time, what, how many years, 40 years, 50 years after the statute was amended? I'm having a hard time understanding why all of a sudden there's an injury now that's never been pursued earlier. Your Honor, the statute was amended in 1982. And certainly as to radio broadcasting and probably a lot of other forms of performance, a sound recording owner could find that it did benefit them. But in this instance, where a digital audio transmission can actually undercut the value of the sound recordings and the need to take a license, it is harmful. And one of the things about the district court's analysis under the common law of misappropriation is that it looked at the form of injury. And some of the issues we've heard raised today about whether it would impair broadcasting or performance on other mediums, those broadcasters still have the ability to raise appropriate defenses, and the district court can weigh whether or not there are damages that have been incurred there by the sound recordings owners. But in this instance, the district court made a finding that the property interests of Flo and Eddie had been misappropriated, easily misappropriated by SiriusXM, and had done so to the damage of Flo and Eddie. I would have, you know, I think along the lines of what Judge Tom was saying, you said there's nothing really unusual about this. I mean, I think this is the only case like that. And if the Ninth Circuit were to hold that, that there are, you do not, they don't have those rights in any of the other circuits. They've lost there, correct? Your Honor, that's in Florida and New York they have. There's no statute there that governs. But you asked earlier about whether there were other cases, the Blue Beat action, which we cite in our brief. In that case, there was a website that allowed for streaming and downloading of sound recordings. And Judge Satin found also a violation of 980, along with a finding that the misappropriation of the sound recordings and of a conversion of those sound recordings were actionable under the common law. Let me ask you this, let me ask you this. Can you address the argument made primarily by the professor's amicus brief that Section 980's use of the exclusive ownership language dates back to the 1800s? If you do not dispute that, then why shouldn't we apply the public meaning of that language from when the state was first enacted? In the original versions of the statute, it referred to exclusive ownership, first of the inventions of the mind, and then later when it was amended the first time, exclusive ownership of what is in arts and letters. It is only with the amendment in 1982 that the exclusive ownership was specifically described in connection with sound recordings. And sound recordings, you know, the cornerstone of the right of a sound recording is the ability to perform it. So those earlier versions of the statute that described exclusive ownership did so in the context of commonly written music or something that might be published or made available in a different capacity. Here we are talking about the performance itself, the artistic rendition that is embodied in a material object and that there is value as California courts have repeatedly found that there's intrinsic value in that. And it's the California Supreme Court in Stanley recognized that there had been value embodied in plaintiff's programs that were, that had been appropriated wrongfully by CBS. If we ruled in your favor though, wouldn't we be creating a split with the Second Circuit? No, Your Honor, the Second Circuit was very clear that it does not have a statutory regime. And so it was different than California law. It did not have a statute like 980. And so it could not, you know, its determination was made on its own history there. But didn't originally, didn't New York have basically field codes that were adopted by California from New York for copyright protection? There were some codes that the legislature here used, but they had before it a very clear record of wanting to protect ownership rights broadly. And to Judge Lee's earlier question about what we should we make of the federal law, when the legislature acted here in 1982, it had before it a federal law that very clearly exempted public performance. And it, I heard Sirius XM say that it could not have mirrored that performance exemption. It absolutely could have. The one exemption in the statute is for cover songs, and that is verbatim lifted from the federal law. So they're looking at what other law the legislature had before it when it enacted this in 1982, including statutes in North Carolina and South Carolina where they did exempt public performance. It's clear that it was deliberate. If they wanted to carve out public performance, there was a clear path to do so. And, Your Honor, you asked earlier, you know, our client, Flo and Eddie, they had licensed their performances to other types of entities prior to bringing this litigation. It was not a novel concept that public performance may be subject to license rights. And just as they license for movie usage, for restaurants, for other places, other establishments that are going to perform them publicly, that SiriusXM now contends this is a novel interpretation of the law is against the law that we've seen. And, again, I do think it's important that SiriusXM is not here contesting the district court's determination that there was misappropriation and conversion. And that is because they don't contest there's a property right here. There is. And even SiriusXM concedes that there is a property right, that Flo and Eddie invested its time and money and resources in, that it was easily misappropriated by SiriusXM at no cost, the cost to buy a CD, and that it caused injury. And the district court so held that it undermined the licensing rights and royalties of Flo and Eddie. We believe any of those grounds are an appropriate basis on which to affirm what the district court found here above and beyond the statutory analysis that 980 calls for. Should we consider the term exclusive ownership to be ambiguous in light of the Pandora decision? Your Honor, it is not ambiguous on its face to say it's an exclusive ownership as against all other persons and with only one exception for cover songs. That being said, the context around how the statute came to be, the long history of cases in California, and the fact that the California legislature intentionally did not adopt a public performance exception all corroborate the way exclusive ownership should be interpreted. California already had on the books a criminal law in 653H which prescribed criminal conduct for copying sound recordings for the purpose of public performance. It is very clear that the California legislature deemed it important to protect not just the sale of an actual record or tape, but the artistic performance that was embodied in it. So, Your Honor, the statute is clear on its face, but even with the context, it makes clear that a deliberate decision was made to encompass performance rights rather than carve them out as the federal government had done and the states had done as well. And, Your Honor, if you look at the Stanley versus Columbia broadcasting case, which is a California Supreme Court action, there, a show had been submitted to CBS. They copied portions of it and then developed their own broadcast that they then aired on radio, and the California Supreme Court found that they had embodied plaintiff's program, not piracy, embodying a performance. Likewise, the California Appeals Court in Erickson found that Phoenix hadn't just copied or made imitations of the discs, that they had actually appropriated the product itself. So, we believe the long line of cases that predated the introduction of 980 make clear that California regarded sound recordings differently. And exclusive ownership has a specific meaning, both in the statute and in the context of property rights that has gone back 100 years. It makes clear that it is rights as against all others. Now, counsel had described federal law and the need to specifically carve out aspects of the Copyright Act. State law is broad and is presumed to encompass all of these rights absent a specific direction otherwise, and that's what we have here in the state court's adoption of this statute, in the legislature's adoption of the statute. Again, it withdrew from the history of cases in misappropriation and conversion that made clear that sound recordings were subject to protection. We don't think that there's some broad, radical change in the landscape that this causes. SiriusXM has been paying royalties, both to us and to the major record labels, without there being any disruption in how they operate. And, of course, there are now many entities that are subject to the federal requirement that they pay royalties for sound recording usage. And broadcasters have, as SiriusXM does, have to pay for the underlying composition. If they want to establish a compulsory license to do so, that avenue is available to them. What's not available is taking a CD, using it to profit, and to be able to serve 30 million subscribers for an enormous amount of money, and to pay the sound recording owners nothing. That's actually a denigration of the sound recording right. Just briefly on the Commerce Clause issue that Judge Callahan raised, it is clear that federal law intended to carve out protection and the ability for states to regulate in the area of pre-1972 sound recordings. They were explicit about it, and this is expressly authorized action. And it is of no burden to simply have to pay a license fee or royalty for a sound recording owner so that you can broadcast it on your satellite service. Thank you, Your Honors. Thank you for your argument. We'll go back for a rebuttal. Perhaps you want to address the arguments that counsel for the appellee stated you didn't address in your opening. That would be helpful for me anyway. Sure. If you're talking about unfair competition and conversion, of course, we're contesting that. We contested in our brief. And the answer to that is pretty simple. Cases like Erickson-Heilman, unfair competition and conversion cases in California, all were talking about piracy, copying without authorization. This court held in Pandora that those cases were all about piracy and had nothing to do with a performance right. And as the New York Court of Appeals has explained, there is a big difference between piracy and performance. Piracy has always been understood to be unfair competition because you're taking somebody's work and you're using it for a purpose for which it's not meant. A record isn't meant to be copied and resold in competition with a record company. But a record, of course, is meant to be played. That's the whole purpose of it. It's meant to be performed in Flo and Eddie's parlance. And so no court has ever held that performing, playing a record is unfair competition. The Second Circuit has held that it's not. The Florida Supreme Court has held that it's not. A district court in Illinois has held that it's not. And no court ever has held that it is. So that's the answer to unfair competition. Now, as to Judge Tomlin's question, why didn't they ever bring suit or try to enforce this right in 1982? The story they say is they liked when radio stations played their songs. Well, first of all, I don't understand why they don't like when Sirius XM plays their songs. It's not like this is an interactive service where a user can actually pick the song. They hear the song on the radio just like they did on the radio in 1982. But more important, they say that they didn't sue because they didn't think it was worth it for them to enforce a performance right. It's a good story. But in 1978, when Congress was deciding whether to include a performance right, you can look in the Register of Copyrights report starting at 459. The Record Industry Association of America, who is an amicus in this case, submitted a long document saying that they wanted and needed a performance right. Now, they wanted a compulsory licensing regime. It's true they didn't think that a radical right like this was plausible. But they were asking for a performance right at the time. So it's totally implausible that they got one in 1982 and never enforced it. Now, as to exclusive ownership... Did you praise the Latches' defense before the district court? I think it was a deferred defense. I'm not sure if it was litigated. I'm not sure Latches is exactly the right frame because, you know, they didn't... Sirius XM wasn't around in 1982. But I think it goes to the statutory construction because you always look at the conduct and understandings of the relevant actors, including, obviously, legislators, but also the regulated parties, to figure out what a statute meant. And without a clear statement, you can't possibly construe a statute to mean what they say because it means everybody missed it for 30 years. Now, on whether exclusive ownership necessarily includes the right to stop everybody who buys an album from playing it, I think that question answers itself because it would stop me from playing it in my living room, if that were right. But it was also answered by the Pandora case. I see I'm out of time, Your Honor. Let me find out if anyone has any additional questions. Do any of the judges have any additional questions? I don't, but I'm not sure counsel has finished with his answer. Okay. So, yeah, go ahead. Wrap up on your answer. I was just going to get to the covers exception. Three very quick points on that. One is Pandora already said that the covers exception doesn't answer this question. Two is that the covers exception by its terms only applies to piracy. So it doesn't say anything in particular about a performance right, about whether there was a performance right in the statute in the first place. And third, what it does is highlight that the legislature knew how to make exceptions to the rights that it did adopt, and yet strikingly didn't make any exceptions from a performance right, including for bars, restaurants, or even people that buy the records. And that seems to me as good as evidence as any that the plaintiff's reading is implausible and should be rejected. All right. Thank you both for your excellent argument. This matter will stand submitted. Thank you.
judges: Tallman, Callahan, Lee